UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRACKERS DEMO, LLC,

     Plaintiff,

                              Case No. 22-cv-12821

v.                           Hon. Matthew F. Leitman

OPERATING ENGINEERS LOCAL
324 PENSION FUND,

     Defendant.

_____/

**OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN
PART CRACKERS DEMO, LLC'S MOTION FOR SUMMARY
JUDGMENT (ECF No. 20);  (2) DENYING DEFENDANT OPERATING
ENGINEERS LOCAL 324 PENSION FUND'S MOTION FOR SUMMARY
JUDGMENT (ECF No. 19); AND (3) REMANDING TO ARBITRATOR
FOR FURTHER PROCEEDINGS**

Between 2016 and 2018, Plaintiff Crackers Demo, LLC ("Crackers"), a demolition company, and the International Union of Operating Engineers Local No. 324 ("Local 324") were parties to a collective bargaining agreement (a "CBA"). Under that CBA, Crackers was obligated to make contributions to Defendant Operating Engineers Local 324 Pension Fund (the "Fund") on behalf of three Crackers employees.  On an annual basis, those required contributions totaled roughly $100,000.

In June of 2018, the CBA terminated, and Crackers ceased having an obligation under that agreement to contribute to the Fund on behalf of its three

1

employees.  Crackers nonetheless continued to send contributions to the Fund on behalf of those employees.  But the Fund refused to accept those contributions. Instead, the Fund declared that because Crackers' contractual obligation to make the contributions had ended, Crackers had partially withdrawn from the Fund.  The Fund further claimed that based upon Crackers' purported partial withdrawal, Crackers owed the Fund nearly $41 million dollars – an amount 400 times greater than Crackers' annual required contributions to the Fund under the CBA.  Crackers thereafter objected to both the Fund's determination that it had partially withdrawn and to the Fund's calculation of the amount of its liability.  The parties later submitted their dispute for arbitration pursuant to the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), 29 U.S.C. §§ 1381-1461.

While issues of partial withdrawal liability can be complex, the dispositive issue before the arbitrator with respect to whether Crackers partially withdrew from the Fund was straightforward: were Crackers and the company that owned Crackers, Rieth-Riley Construction Co. ("Rieth-Riley"), obligated to make contributions to the Fund under one CBA or under more than one CBA?  For the reasons explained below, if Crackers and Rieth-Riley were obligated to contribute to the Fund under only one CBA, then Crackers did not partially withdraw from the Fund and did not incur partial withdrawal liability.  Conversely, if Crackers and Rieth-Riley were

obligated to contribute to the Fund under more than one CBA, then Crackers did partially withdraw from the Fund and did incur partial withdrawal liability.

The arbitrator ruled as a matter of law that Crackers and Rieth-Riley were obligated to contribute to the Fund under more than one CBA.  Based on that determination, he entered summary judgment in favor of the Fund on its claim that Crackers had incurred partial withdrawal liability (the "Award").  He reserved for future proceedings a ruling on Crackers' challenge to the amount of its liability.

Crackers thereafter filed this action in which it asks the Court to vacate the Award.  Now before the Court are the parties' cross-motions for summary judgment. Crackers' motion requests an order vacating the Award and directing entry of a judgment determining that it did not incur partial withdrawal liability; the Fund's motion seeks an order dismissing Crackers' Complaint and confirming the Award.

The Court concludes that the Award must be vacated.  The arbitrator clearly erred when he resolved the question of Crackers' liability for a partial withdrawal on summary judgment.  For the reasons explained below, on the current record, the question of whether Crackers and Rieth-Riley were obligated to contribute to the Fund under one or more than one CBA cannot be resolved – and should not have been resolved by the arbitrator – as a matter of law.

Accordingly, the Court **GRANTS** Crackers' motion **IN PART** to the extent that it seeks to vacate the Award, **DENIES** the remainder of Crackers' motion,

**DENIES** the Fund's motion in its entirety, and **REMANDS** this action to the arbitrator for further proceedings consistent with this Opinion and Order.

## I

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the MPPAA are two federal statutes that address the operation of, and proceedings related to, multiemployer pension plans like the Fund. To put the dispute between the parties here in context, the Court begins with a brief overview of the relevant aspects of ERISA and the MPPAA.

As this Court has previously explained, Congress enacted ERISA and the MPPAA in order to protect employees' retirement benefits and to establish procedures for resolving disputes related to employer liability to pension benefit funds:

> Congress enacted ERISA to ensure that 'if a worker has been promised a defined pension benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit – he actually will receive it.'" *DiGeronimo Aggregates, LLC v. Zemla, et al.*, 763 F.3d 506, 509-10 (6th Cir. 2014) (*quoting Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980)). "ERISA also created the Pension Benefit Guaranty Corporation ("PBGC") to administer a newly-formed pension plan termination insurance program." *Id*. "Under that program, PBGC would collect insurance premiums from covered pension plans and provide benefits to participants in those plans if their plans terminate with insufficient assets to support the guaranteed benefits." *Id*. After ERISA had been in place for a number of years, "a significant number of multiemployer plans" began

4

experiencing "extreme financial hardship," and the PBGC became "overwhelmed by obligations in excess of its capacity." *Id.* At the direction of Congress, the PBGC analyzed the situation and determined that ERISA "failed to address the adverse consequences that occurred when an employer withdrew from a multiemployer pension plan." *Id.* To address this shortcoming in ERISA, the PBGC "proposed rules under which a withdrawing employer would be required 'to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation.'" *Id.* (*quoting Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 723 (1984)). In response to the PBGC's proposal, Congress enacted the MPPAA. *Id.* "Relevant here, the MPPAA provides that if an employer withdraws from a multiemployer fund, it must make a payment of 'withdrawal liability,' which is calculated as the employer's proportionate share of the fund's 'unfunded vested benefits[.]'" *Id.* (*quoting* 29 U.S.C. § 1381(b)(1)).

*Carpenters Pension Tr. Fund-Detroit & Vicinity v. Brunt Assocs.*, No. 16-cv-13928, 2020 WL 4499888, at *1 (E.D. Mich. Aug. 5, 2020).

An employer's withdrawal liability may be "complete" or "partial." 29 U.S.C. § 1381(a). Partial withdrawal liability, which is at issue in this case, occurs when, among other things, there has been "a partial cessation of the employer's contribution obligation" for the plan year. 29 U.S.C. § 1385(a)(2).[1] Such a "partial cessation" occurs when, during a plan year:

---

[1] There is a second basis on which an employer may be found to have partially withdrawn: that is, where there is a "70-percent contribution decline" in a plan year. *See* 29 U.S.C. § 1385(a)(1). That alternate basis for partial withdrawal liability is not relevant in this action.

the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required [...]

29 U.S.C. § 1385(b)(2)(A)(i) (the "Partial Cessation Statute").[2]

When a court assesses whether an employer has partially withdrawn from a multiemployer fund, it must apply what is known as the "common control" rule. Under that rule, "all such trades and businesses" which are "under common control" must be treated "as a single employer." 29 U.S.C. § 1301(b)(1). A group of trades and businesses under "common control" is known as a "control[] group." 29 U.S.C. § 1301(a)(14). The common control rule is intended "to ensure that employers will not circumvent their ERISA and MPPAA obligations by operating through separate entities." *Mason & Dixon Tank Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 852 F.2d 156, 159 (6th Cir. 1988).

Finally, the MPPAA contains "detailed" provisions governing the process through which a fund and employer must resolve all withdrawal liability disputes.

---

[2] There is a second basis on which a partial cessation of an employer's contributions may be found: that is, where "an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased." 29 U.S.C. § 1385(b)(2)(A)(ii). That basis is not relevant in this action.

*Id.* at 159-60.  As relevant here, the MPPAA requires that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections [governing withdrawal liability] shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1).  Then, "[u]pon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2).

With this basic background in mind, the Court will now turn to the facts of this case.

## II

## A

There are five key entities in this action.  The first two – Rieth-Riley and Crackers – are closely related.  Rieth-Riley is a "full-service heavy/highway construction company for road, commercial and private projects" in Michigan. (Affidavit of Rieth-Riley Chief Financial Officer, Michael J. Weber, at ¶ 3, ECF No. 19-21, PageID.391.)   In 2015, Rieth-Riley formed Crackers as a demolition contractor. (*See* Operating Agmt., ECF No. 20-1, PageID.519.)  Rieth-Riley owns 100% of the membership interest in Crackers. (*See id. See also* Weber Aff. at ¶ 4, ECF No. 19-21, PageID.391.)  In light of that ownership, Rieth-Riley and Crackers

are in the same control group (the "Crackers/Rieth-Riley Control Group").  Thus, as both parties to this action agree, Crackers and Rieth-Riley are treated as a single "employer" for the purpose of determining Crackers' partial withdrawal liability. (*See* Fund's Mot., ECF No. 19, PageID.194, 197; Crackers' Mot., ECF No. 20, PageID.476.)

The third key entity in this action is Local 324.  Local 324 is a union that represented employees of both Crackers and Rieth-Riley during the relevant time period. (*See* Crackers' Mot., ECF No. 20, PageID.480-481.)

The fourth key entity is the Michigan Infrastructure and Transportation Association ("MITA").  MITA is a trade organization "which is comprised of hundreds of employers that hire Local 324's members to repair the State's roads." *Operating Engineers' Loc. 324 Fringe Benefit Funds v. Rieth-Riley Constr. Co*, --- F.Supp.3d ---, 2023 WL 4409096, at *2 (E.D. Mich. July 6, 2023).  *See also* About Us, MITA, https://thinkmita.org/about/#about (last visited February 15, 2024).

The last key player here is the Fund.  The Fund is a multiemployer pension plan governed by the provisions of ERISA.  Local 324 has entered into CBAs with certain employers that require the employers to contribute to the Fund on behalf of employees represented by the union.

**B**

**1**

In February 2008, Rieth-Riley signed a power of attorney appointing MITA as its collective bargaining representative (the "Rieth-Riley POA"). (*See* Rieth-Riley POA, ECF No. 21-11.)  In the Rieth-Riley POA, Rieth-Riley authorized MITA to act "as its agent to negotiate and sign [CBAs]" with several unions, including Local 324. (*Id.*, PageID.856.)

Five years later, in 2013, MITA negotiated and signed on behalf of some of its members a new CBA with Local 324.  This new CBA covered, among other things, all work on "highway[s]", "roads," and "streets" in a specific territory, and this CBA became known as the "Road Agreement." (Road Agmt., ECF No. 19-6, PageID.272.)  The Road Agreement states that it terminates on June 1, 2018. (*See id.*, PageID.309.)

While MITA negotiated and executed the Road Agreement, it did so "only as the collective bargaining agent" of certain employers that it represented, not on its own behalf. (*Id.,* PageID.272.)  The parties to this action agree that Rieth-Riley is one of the employers that MITA bound to the terms of the Road Agreement.[3]  When

---

[3] The record before the Court does not contain a standalone document through which MITA, acting pursuant to the Rieth-Riley POA, specifically bound Rieth-Riley to the terms of the Road Agreement.  However, both parties agree that MITA bound Rieth-Riley to the terms of the Road Agreement. (*See* Crackers' Mot., ECF No. 20, PageID.481; Fund's Mot., ECF No. 19, PageID.199.)

MITA did so, Rieth-Riley became obligated under the Road Agreement to pay contributions to the Fund for each hour of covered work by its employees who were members of Local 324. (*See id.*, PageID.279-296.)

On December 14, 2015, Rieth-Riley formed Crackers. (*See* Operating Agmt., ECF No. 20-1, PageID.519.) Two months later, in February 2016, Crackers signed a power of attorney with MITA that mirrored the Rieth-Riley POA (the "Crackers POA"). (*See* Crackers POA, ECF No. 19-5.) In the Crackers POA, Crackers authorized MITA to act "as its agent to negotiate and sign [CBAs]" with several unions, including Local 324. (*Id.*, PageID.267.) Both parties to this action agree that MITA subsequently bound Crackers to the terms of the Road Agreement.[4] Crackers had three employees whose work was covered by the terms of the Road Agreement. (*See* Award, ECF 21-2, PageID.742.) On behalf of those three employees, Crackers made contributions to the Fund of less than $100,000 per year. (*See* 10/24/2023 Hr'g Tr., ECF No. 27, PageID.975.)

## 2

While Crackers and Rieth-Riley were both bound to the terms of the Road Agreement, the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 151 *et*

---

[4] As with Rieth-Riley, the record does not contain a document through which MITA bound Crackers to the terms of the Road Agreement. But, again, both parties agree that MITA did so and that Crackers is bound to the terms of the Road Agreement. (*See* Crackers' Mot., ECF No. 20, PageID.477-478; Fund's Mot., ECF No. 19, PageID.197.)

*seq*., imposed upon them differing obligations at the termination of that agreement.
The differing obligations stemmed from two different sections of the NLRA: Section
9(a), 29 U.S.C. § 159(a), and Section 8(f), 29 U.S.C. § 158(f).  The Fifth Circuit has
provided a helpful explanation of the differences between these two sections:

> Section 9(a) of the NLRA requires employers to bargain
> with unions that have been "designated or selected for the
> purposes of collective bargaining by the majority of the
> employees in a unit appropriate for such purposes." 29
> U.S.C. § 159(a); *see also Nova Plumbing, Inc. v. NLRB,*
> 330 F.3d 531, 533 (D.C. Cir. 2003). However, the Act
> treats construction-industry employers differently with
> respect to the majority-support requirement. *Id.* Section
> 8(f) allows a contractor to sign "pre-hire" agreements with
> a union regardless of the union's majority status. 29 U.S.C.
> § 158(f); *Nova Plumbing,* 330 F.3d at 534; *In re Staunton
> Fuel & Material, Inc.,* 335 NLRB 717, 718 (2001). The
> reason for this limited exception lies in the unique nature
> of the construction industry, which is organized differently
> because employees frequently work for multiple
> employers for short periods of time. *See Nova Plumbing,*
> 330 F.3d at 534; *Am. Automatic Sprinkler Sys., Inc. v.
> NLRB,* 163 F.3d 209, 214 (4th Cir. 1998); *NLRB v.
> Catalytic Indus. Maint. Co.,* 964 F.2d 513, 515 n. 1 (5th
> Cir. 1992).
>
> Sections 8(f) and 9(a) also differ in their treatment of the
> employer's bargaining obligation after a contract expires.
> *See Staunton Fuel,* 335 NLRB at 718; *see also Nova
> Plumbing,* 330 F.3d at 533. A construction-industry
> employer may refuse to bargain after the expiration of an
> 8(f) agreement because the union never enjoyed the
> presumption of majority support. *Id.* at 534; *Am.
> Automatic Sprinkler,* 163 F.3d at 215. In contrast, a non-
> construction employer must continue bargaining with a
> union after a 9(a) agreement expires because the union is
> entitled to a continuing presumption of majority status.

> *Nova Plumbing,* 330 F.3d at 534; *Am. Automatic Sprinkler,* 163 F.3d at 214; *Staunton Fuel,* 335 NLRB at 718; *Barrington Plaza & Tragniew, Inc.,* 185 NLRB 962, 963 (1970), *enforced in part sub nom. NLRB v. Tragniew, Inc.,* 470 F.2d 669 (9th Cir. 1972).

*Strand Theatre of Shreveport Corp. v. N.L.R.B.*, 493 F.3d 515, 518-19 (5th Cir. 2007). Moreover, upon the expiration of a CBA, an employer who is subject to Section 9(a) must "'freez[e] the status quo' and 'honor the terms and conditions of [the] *expired* collective bargaining agreement' as [it] negotiate[s] a new one." *Operating Engineers' Loc. 324 Fringe Benefit Funds v. Rieth-Riley Constr. Co.*, 43 F.4th 617, 619 (6th Cir. 2022) (emphasis in original) (quoting *Laborer Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 544 n.6 (1988)). An employer who is subject to Section 8(f) has no similar obligation upon the expiration of a CBA.

Here, both parties agree that upon termination of the Road Agreement, the relationship between Crackers and Local 324 was governed by Section 8(f). (*See* Crackers' Mot., ECF No. 20, PageID.488-489; Fund's Mot., ECF No. 19, PageID.198.) The parties also agree that upon termination of the Road Agreement, the relationship between Rieth-Riley and Crackers was governed by Section 9(a). (*See* Crackers' Mot., ECF No. 20, PageID.489; Fund's Mot., ECF No. 19, PageID.199.)

12

**3**

Beginning in 2011, Rieth-Riley and Local 324 also entered a series of agreements that were each titled "Rieth-Riley Construction Co Winter Plant Maintenance Agreement." (*See* Winter Maintenance Agmts., ECF No. 19-25, PageID.425-435.)   Rieth-Riley and Local 324 entered into the final Winter Maintenance Agreement – the one that is relevant for purposes of this action – in 2017 (the "2017 Winter Maintenance Agreement"). (*See* 2017 Winter Maintenance Agmt., ECF No. 19-25, PageID.433-435.)   The 2017 Winter Maintenance Agreement commenced on March 1, 2017, and terminated on February 29, 2020. (*See id.*, PageID.434.)   Crackers did not sign any similar Winter Maintenance Agreements with Local 324.

The 2017 Winter Maintenance Agreement specified the wages to be paid to the Local 324 members who performed work for Rieth-Riley during what was called the "pre-production" season, and the agreement also required Rieth-Riley to make contributions to the Fund on behalf of those employees at certain stated rates. (*Id.*, PageID.433.)   The 2017 Winter Maintenance Agreement further provided that if a Rieth-Riley employee "work[ed] longer than eight (8) weeks during any one pre-production season, then the hourly contribution made on his behalf [to the Fund] for

wages and fringe benefit hours worked in week nine (9) and thereafter shall be at the rate identified in" the Road Agreement. (*Id.*, PageID.434.[5])

The 2017 Winter Maintenance Agreement did not contain any terms governing any other aspects of the relationship between Rieth-Riley, the employees covered by the agreements, and Local 324. Instead, the 2017 Winter Maintenance Agreement provided that "[a]ll of the employees working under [that] Agreement shall be covered by the terms and conditions of the" Road Agreement. (*Id.*, PageID.433.)

## 4

The Road Agreement terminated on June 1, 2018. (*See* Road Agmt., ECF No. 19-6, PageID.309; Union Correspondence, ECF No. 19-14, PageID.365.) At that time, Local 324 announced that it would not negotiate a successor master CBA with MITA, as it had done in the past. (*See* Union Correspondence, ECF No. 19-14, PageID.365). Instead, Local 324 said that it would negotiate separate CBAs with each employer – including Crackers and Rieth-Riley. (*See id.*, PageID.366.)

---

[5] The 2017 Winter Maintenance Agreement does not use the full formal name for the Road Agreement. Instead, the 2017 Winter Maintenance Agreement refers to the "Master Agreement." (2017 Winter Maintenance Agmt., ECF No. 19-25, PageID.433-434). Both parties agree that the references to the "Master Agreement" in the 2017 Winter Maintenance Agreement should be read as references to the Road Agreement. (See 10/24/2023 Hr'g Tr., ECF No. 27, PageID.996, 1027.)

Even though Crackers had no contractual obligation to continue making contributions to the Fund once the Road Agreement expired, it attempted to do so. For instance, Crackers sent contributions to the Fund in June, July, August, and September of 2019. (*See* Check Rejections, ECF No. 20-1, PageID.644-652.)  The Fund refused to accept Crackers' contributions on the ground that "there [was] no legal basis for accepting contributions without a written agreement between [Crackers] and [] Local 324." (*Id.*, PageID.644.)  Throughout this time, Crackers continued to perform the same work that had been covered under the Road Agreement in the same territory. (*See* Interrogatory No. 16, Cracker's Discovery Responses, ECF No. 19-8, PageID.330.)

**5**

On September 22, 2020, the Fund notified Crackers that it had determined that (1) Crackers had partially withdrawn from the Fund pursuant to the Partial Cessation Statute, and (2) by virtue of that partial withdrawal, Crackers had incurred liability of more than $40 million. (*See* Notice of Partial Withdrawal, ECF No. 20-1, PageID.509.)

Crackers disputed the Fund's determination that it had partially withdrawn and the amount of withdrawal liability assessed by the Fund, and Crackers made a formal demand that the Fund review those determinations. (*See* Award, ECF No. 19-

15

2, PageID.227.)  The Fund conducted that review and declined to alter or amend its assessment. (*See id*.)

## C

### 1

On April 28, 2021, Crackers initiated arbitration proceedings with the American Arbitration Association (the "AAA"). (*See id.*)   Crackers sought review of the Fund's determination that it (Crackers) had partially withdrawn and the Fund's assessment of withdrawal liability. (*See id*.)   The AAA thereafter appointed an arbitrator to preside over the proceedings. (*See id*.)

The parties and the arbitrator agreed to bifurcate the arbitration into two phases. (*See id*.)  Phase 1 would focus on the question of liability: did Crackers partially withdraw from the Fund?  Then, if Crackers was found to have partially withdrawn, Phase 2 would determine the amount of Crackers' withdrawal liability. (*See id*.)

### 2

In Phase 1 of the arbitration, Crackers moved for summary judgment. Crackers primarily contended that the Fund could not show a partial withdrawal under the Partial Cessation Statute.[6]  As noted above, the Partial Cessation Statute

---

[6] The record does not contain the parties' summary judgment submissions to the arbitrator.  Nonetheless, the Court has been able to ascertain those arguments by reviewing the Award and the parties' submissions in this action.  The description of

provides that an employer partially withdraws when it "permanently ceases to have an obligation to contribute *under one or more but fewer than all [CBAs]* under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the [CBA] of the type for which contributions were previously required […]" 29 U.S.C. § 1385(b)(2)(A)(i) (emphasis added). Crackers argued that a partial withdrawal cannot occur under the Partial Cessation Statute where an employer is obligated to make contributions under *only one* CBA. That is so, Crackers contended, because where an employer is required to contribute under only one CBA and where the employer ceases to be obligated to contribute under that CBA, then the employer's contribution obligations have terminated under *all* – rather than "fewer than all" – of its CBAs.  Applying that rationale here, Crackers argued that a partial withdrawal could not have occurred in this case because the Crackers/Rieth-Riley Control Group (the relevant "employer" here under the common control rule) was obligated to contribute to the Fund under only one CBA: the Road Agreement.  As part of this argument, Crackers characterized the Road Agreement as a *single* CBA between Local 324, on one hand, and all of the employers whom MITA had bound to the terms of that agreement (including the Crackers/Rieth-Riley Control Group), on the other hand.

---

the parties' arguments to the arbitrator above is drawn in large part from the parties' arguments to the Court.

The Fund accepted Crackers' contention that a partial withdrawal cannot occur under the Partial Cessation Statute where an employer is obligated to make contributions under only one CBA.  But the Fund sharply disagreed with Crackers' assertion that the Crackers/Rieth-Riley Control Group was obligated to contribute to the Fund under just one CBA.  The Fund insisted that Crackers had mischaracterized the Road Agreement as a single CBA between Local 324 and all of the employers who agreed to its terms.  The Fund contended that, instead, the Road Agreement was a template for *separate* CBAs to be entered into by Local 324 and each individual employer – including individual employers that were part of the same control group.  The Fund told the arbitrator that each time MITA bound an employer to the Road Agreement, a separate and independent CBA was formed between that employer and Local 324.  Applying that rationale to this case, the Fund argued that there was one Road Agreement between Crackers and Local 324, on one hand, and that there was an entirely separate Road Agreement between Rieth-Riley and Local 324, on the other hand.  The Fund then insisted that because the Crackers/Rieth-Riley Control Group had contribution obligations under these *two* independent Road Agreements, Crackers could not avoid partial withdrawal liability based upon its claim that the control group had only one CBA with Local 324.

**3**

On October 31, 2022, the arbitrator issued the Award. (*See* Award, ECF No. 19-2.) In the Award, the arbitrator denied Crackers' motion for summary judgment. And even though the Fund had not moved for summary judgment in its favor, the arbitrator granted summary judgment in favor of the Fund; he ruled that, as a matter of law, Crackers had partially withdrawn from the Fund. (*See id.*, PageID.240.)

The arbitrator concluded, as the Fund had argued, that Crackers and Rieth-Riley each had *separate* Road Agreements with Local 324. He further agreed with the Fund that a partial withdrawal had occurred when Crackers' contribution obligations ended under its Road Agreement while Rieth-Riley's contribution obligations continued (pursuant to Section 9(a)) under its separate Road Agreement.

The arbitrator offered four reasons in support of his conclusion that Crackers and Rieth-Riley each had its own stand-alone Road Agreement with Local 324 and that the Crackers/Rieth-Riley Control Group was therefore obligated to make contributions under more than one CBA. His entire analysis – which consisted of only two paragraphs that made up roughly a single page of text – was as follows:

> Crackers and Rieth-Riley each had its own CBA under which each was separately obligated to make contributions to the Fund. There are four reasons for this finding. First, it is undisputed that Crackers and Rieth-Riley were separate legal entities. Claimant provides no legal authority that their membership in a control group turns their two individual Road Agreement CPAs into a single "Crackers Control Group" Road Agreement CBA. The

case law Claimant cites is neither authoritative, nor persuasive, nor supportive of its position that the Rieth-Riley Road Agreement and Crackers Road Agreement CBAs are actually a single CBA. The dicta refers only to a "host of agreements" with 8(f) employers. Rieth-Riley is a 9(a) employer, with a distinctly different collective bargaining relationship with the Union.

Second, each entity gave its own POA to MITA: Rieth-Riley in 2008; Crackers in 2016. Rieth-Riley had a CBA obligation to make contributions to the Fund in 2013. Crackers did not have a CBA obligation to make contributions to the Fund until 2016. The Road Agreement itself provides: "liabilities of the Contractor members of the Association who become parties to this Agreement shall be several and not joint." (R-7, 0003) Thus, Crackers and Rieth-Riley each had its own liability separate from the other.

Third, Rieth-Riley and Crackers each had different obligations under their CBAs. Rieth-Riley, a 9(a) employer, had an obligation under its Road Agreement CBA to continue contributing to the Fund when the Road Agreement expired on June 1, 2018. Crackers, an 8(f) employer, had no obligation under its CBA to continue contributions, or even to bargain with the Union when its Road Agreement CBA expired on June 1, 2018.

Fourth, only Rieth-Riley signed Winter Plant Maintenance Agreements that varied its Road Agreement CBA. For a limited "pre-production period" it allowed lower salary and fringe benefits for covered employees who worked on "asphalt plants and related equipment repair." It was in effect during the time Crackers had a Road Agreement CBA, but was only signed by Rieth-Riley and only affected Rieth-Riley's obligations under its CBA.

Crackers and Rieth-Riley each had their own Road Agreement CBA. Crackers permanently ceased having an obligation to contribute under its CBA on June 1, 2018.

> Rieth-Riley had a continuing obligation to contribute under its CBA on June 1, 2018. The Crackers/Rieth-Riley Control Group permanently ceased to have an obligation to contribute under one but not all CBAs under which it was previously obligated to contribute. It continued to perform work in the jurisdiction of the CBA of the type for which contributed were previously required. The Crackers/Rieth-Riley Control Group had a partial withdrawal under ERISA Sec. 4205(b)(2)(A)(i).

(*Id.*, PageID.233-234.)

## D

Crackers filed this action on November 21, 2022. (*See* Compl., ECF No. 1.) In its Complaint, Crackers asks the Court to vacate the Award finding it liable for a partial withdrawal from the Fund. (*See id.*)

## 1

On March 1, 2023, the Fund filed a motion to dismiss based upon, among other things, a lack of subject-matter jurisdiction. (*See* Mot. to Dismiss, ECF No. 11.) In that motion, the Fund argued that the Court did not have subject-matter jurisdiction over this action because the arbitration proceedings had not been completed. (*See id.*, PageID.73.) In support of that argument, the Fund cited 29 U.S.C. § 1401(b)(2) ("Section 1401(b)(2)"). (*See id.*) As noted above, Section 1401(b)(2) provides that a party to an arbitration concerning withdrawal liability may bring an action challenging the arbitrator's ruling "upon completion of the arbitration proceedings…." 29 U.S.C. § 1401(b)(2). The Fund argued that since the

21

arbitrator's ruling resolved only the question of liability – and did not decide the amount owed – the arbitration proceedings were not complete, and the Court therefore lacked subject-matter jurisdiction. (Mot. to Dismiss, ECF No. 11, PageID.73-76.)  In response, Crackers argued that the "completion" requirement in Section 1401(b)(2) was not jurisdictional and that, in any event, the arbitration proceedings should be considered "complete" in relevant part because the parties agreed to bifurcate liability and damages, and the liability phase had concluded. (Crackers' Resp., ECF No. 14, PageID.102-112.)  The parties subsequently filed a stipulation with the Court in which the Fund withdrew its motion to dismiss with prejudice; the Court then entered a stipulated order withdrawing the motion. (*See* Stipulated Order, ECF No. 15.)

**2**

Now before the Court are the parties' cross-motions for summary judgment. (See Mots., ECF Nos. 19, 20.)  In Crackers' motion, Crackers asks the Court to vacate the Award and to enter an order determining, as a matter of law, that Crackers did not partially withdraw from the Fund. (*See* Crackers' Mot., ECF No. 20.)  The gist of Crackers' argument is, once again, that it cannot be deemed to have partially withdrawn under the Partial Cessation Statute because the Crackers/Rieth-Riley Control Group was obligated to contribute to the Fund under *only one CBA*: the Road Agreement. (*See id*.)

In the Fund's motion, the Fund asks the Court to confirm the Award finding that Crackers partially withdrew from the Fund and to dismiss Crackers' Complaint with prejudice. (*See* Fund's Mot., ECF No. 19.)  The Fund again accepts Crackers' contention that a partial withdrawal cannot occur under the Partial Cessation Statute where an employer (or control group) is obligated to make contributions under only one CBA. (See 10/24/2023 Hr'g Tr., ECF No. 27, PageID.981) But the Fund continues to insist that Crackers and Rieth-Riley each had *separate* Road Agreements with Local 324 and that the Crackers/Rieth-Riley Control Group was therefore obligated to contribute to the Fund under *more than one CBA*.  In the alternative, the Fund argues that even if there was only one Road Agreement, the Crackers/Rieth-Riley Control Group was still obligated to contribute to the Fund under more than one CBA because Rieth-Riley was also required to contribute to the Fund under the 2017 Winter Maintenance Agreement.  As support for this argument, the Fund characterizes the 2017 Winter Maintenance Agreement as an independent and stand-alone CBA between Local 324 and Rieth-Riley.

Crackers vigorously disputes the Fund's contention that the 2017 Winter Maintenance Agreement was an independent CBA between Local 324 and Rieth-Riley.  Crackers argues that the 2017 Winter Maintenance Agreement was, instead, an addendum to the single Road Agreement to which Local 324, Rieth-Riley, and Crackers were all parties. (*See* Crackers' Mot., ECF No. 20, PageID.495-496.)

Crackers therefore contends that the existence of the 2017 Winter Maintenance Agreement does not change the fact that the Crackers/Rieth-Riley Control Group was obligated to contribute to the Fund under only one CBA and that there thus could not have been a partial withdrawal under the Partial Cessation Statute.

The Court held a hearing on the cross-motions on October 24, 2023.  The Court thereafter directed the parties to submit supplemental briefs (*see* Order, ECF No. 26), and both parties did so. (*See* Supp. Brs., ECF Nos. 28, 29.)  In the Fund's supplemental brief, the Fund again argues that the Court lacks subject-matter jurisdiction under Section 1401(b)(2) because the arbitration proceedings are not complete. (*See* Fund's Supp. Br., ECF No. 29, PageID.1185-1187.)

### III

Before turning to the merits of the motions, the Court must first determine whether it has subject-matter jurisdiction over this action. *See Williams v. United States*, 927 F.3d 427, 434 (6th Cir. 2019). The Court concludes that it does.

Section 1401(b)(2) is the statute that grants the Court subject-matter jurisdiction to review the Award.  As noted above, that statute provides that a party may seek review of an arbitrator's award "upon completion" of the arbitration proceedings.  That "completion" language, as the Fund acknowledges, is, in effect, an "exhaustion requirement" – one that compels a party to exhaust its administrative

remedies in arbitration before seeking judicial review of an award. (Fund's Supp. Br., ECF No. 29, PageID.1185.)

"[T]he usual practice under the Federal Rules is to regard exhaustion," like the "completion" requirement in Section 1401(b)(2), "as an affirmative defense," not as a jurisdictional requirement. *Jones v. Bock*, 549 U.S. 199, 212 (2007). Indeed, an exhaustion requirement may not be treated as jurisdictional unless it is accompanied by a "clear statement" that Congress intended to bar district court review absent exhaustion. *Kentucky v. U.S. ex. rel. Hegel*, 759 F.3d 588, 597-98 (6th Cir. 2014) (holding that exhaustion of administrative remedies requirement under the Randolph-Sheppard Act, 20 U.S.C. §§ 107-107e, was not jurisdictional because that law did not contain clear statement precluding review until completion of arbitration proceedings).

Section 1401(b)(2) "contains no language tending to exclude district court jurisdiction" absent the completion of arbitration proceedings. *Central States Southeast and Southwest Areas Pension Fund v. T.I.M.E.-DC, Inc.*, 826 F.2d 320, 326-28 (5th Cir. 1987). For that reason, the Sixth Circuit has concluded that "arbitration is not a jurisdictional prerequisite for district court review" under Section 1401(b)(2). *Mason and Dixon Tank Lines, Inc. v. Central States Southeast and Southwest Areas Pension Fund*, 852 F.2d 156, 163 (6th Cir. 1988). And the Fifth Circuit has squarely rejected the argument, advanced by the Fund here, that the

"completion" requirement in Section 1401(b)(2) is jurisdictional because it "clearly indicates Congress's intention to make completion of the arbitral process a jurisdictional prerequisite to district court review." *Central States Southeast and Southwest Areas Pension Fund*, 826 F.2d at 321. *See also JLNW, Inc. v. Nat'l Retirement Fund*, 2018 WL 4757953, at *3 (S.D.N.Y. Sept. 28, 2018) (finding "neither support nor justification" for argument that "completion" requirement should be considered jurisdictional when arbitration, itself, is not jurisdictional). Simply put, consistent with the "usual practice," the "completion" requirement in Section 1401(b)(2) should be treated as an affirmative defense, not as a jurisdictional requirement. *See Bock*, *supra* (treating similar language in the Prison Litigation Reform Act as establishing an affirmative defense).  And because the "completion" requirement is not jurisdictional, the fact that Crackers and the Fund did not complete both phases of their arbitration does not deprive the Court of subject-matter jurisdiction over this action.

But this question remains: is there a non-jurisdictional basis for declining to review the Award now on the ground that the arbitration has not been completed? There is not.  As an affirmative defense, the "completion" requirement is waivable. *See Roskam Baking Co. v. Lanham Mach. Co*., 288 F.3d 895, 901 (6th Cir. 2002) (acknowledging that a party may waive an affirmative defense).  And the Fund plainly waived its "completion" defense here.  Indeed, the Fund expressly agreed to

26

withdraw with prejudice the motion in which it asserted that defense. (*See* Stipulated

Order, ECF No. 15, PageID.169.)    Because the Fund expressly waived its

"completion" defense, the claimed lack of completion here does not preclude the

Court from reviewing the Award.[7]

## IV

The Court now turns to the merits of whether the arbitrator erred when he

determined as a matter of law that Crackers had partially withdrawn from the Fund.

For the reasons explained below, the Court concludes that he did err in making that

determination and that the Court must therefore vacate the Award.

---

[7] In the Court's view, the question of whether the arbitration proceedings here were "complete" for purposes of Section 1401(b)(2) is a close and difficult one.  District courts are split on whether arbitration proceedings are complete where an arbitrator resolves questions of liability but not damages.  *Compare JLNW, supra* (finding proceedings complete under these circumstances); *Trustees of Iam National Pension Fund v. M & K Employee Solutions, LLC*, 2022 WL 4534998 (D.D.C., Sep. 28, 2022) (same), *with National Dairy Assoc. v. Western Conference of Teamsters Pension Fund*, 2017 WL 6310623 (W.D. Wash., Dec. 11, 2017) (finding proceedings incomplete).  In one of the decisions finding that arbitration proceedings were complete under these circumstances, the district court looked to its circuit precedent interpreting the finality requirements in the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq. See JLNW, supra*.  Notably, the Sixth Circuit has suggested that the FAA's finality requirement generally precludes piecemeal review of rulings made in arbitration proceedings. *See Savers Prop. and Cas. Ins. Co. v. Nat'l Union Fire Ins. Co.*, 748 F.3d 708, 716-719 (6th Cir. 2014).  Sixth Circuit precedent may therefore lend support to the conclusion that the arbitration proceedings here were not complete.  However, given the Fund's waiver of the "completion" defense, the Court need not and does not answer the hard question of whether the arbitration proceedings here were complete for purposes of Section 1401(b)(2).

**A**

The parties disagree over the standard under which this Court should review the Award. Crackers argues that the Court should conduct its review *de novo* because the Award rests entirely upon "a conclusion of law." (Crackers' Mot., ECF No. 20, PageID.485, citing *Concrete Pipe and Prod. Of Cal., Inc. v. Const. Laborers Pension Trust*, 508 U.S. 602, 630 (1993).) Crackers acknowledges that findings of fact by an arbitrator are "afforded deference under a 'clearly erroneous' standard," but Crackers insists that the arbitrator made "no such factual determinations." (*Id.*) The Fund counters that the arbitrator resolved "a mixed question of fact and law" when he determined that Crackers partially withdrew, and the Fund contends that the Court should review that question "under the clearly erroneous standard of review." (Fund's Mot., ECF No. 19, PageID.205-206.)

The Court need not – and does not – resolve this dispute because the arbitrator's grant of summary judgment cannot withstand either standard of review.[8]

**B**

As framed by the parties, the dispositive issue with respect to whether Crackers partially withdrew under the Partial Cessation Statute is: was the

---

[8] While there is disagreement between the parties over the standard of review to be applied here, it is at least clear that "the judicial review authorized by § 1401(b)(2) is much more expansive than the narrow review authorized by the FAA." *Freight Drivers & Helpers Loc. Union No. 557 Pension Fund v. Penske Logistics LLC*, 784 F.3d 210, 216 (4th Cir. 2015).

Crackers/Rieth-Riley Control Group obligated to contribute to the Fund under one CBA with Local 324 or more than one such CBA?  The answer to that question turns on the answer to two questions of contract construction posed by the parties' competing positions.  First, should the Road Agreement be construed as a series of *separate* CBAs between Local 324 and every individual employer represented by MITA rather than as *one* CBA to which the union and all of the MITA-represented employers are parties?  Second, should the 2017 Winter Maintenance Agreement be interpreted as a stand-alone CBA between Local 324 and Rieth-Riley?  If the answer to either of these questions is "yes," then a partial withdrawal occurred under the Partial Cessation Statute when Crackers' obligations to contribute to the Fund ended.

These questions of contract construction must be resolved by applying "basic rules of interpretation." *Gallo v. Moen Inc.*, 813 F.3d 265, 268 (6th Cir. 2016) (explaining that these rules apply to the construction of a CBA).  The Sixth Circuit has provided the following helpful summary of those rules and how they should be applied in the summary judgment context:

> We consider as a threshold matter whether a judge or jury should resolve contract disputes.  "The proper interpretation of a contract is a question of law." *JPMorgan Chase Bank, N.A. v. Winget,* 510 F.3d 577, 582 (6th Cir. 2007) (applying Michigan law) (quoting *Archambo v. Lawyers Title Ins. Corp.,* 466 Mich. 402, 646 N.W.2d 170, 174 (Mich. 2002)). Questions of contract interpretation, including those that form the basis for the grant of summary judgment, are subject to de novo review. *Meridian Leasing, Inc. v. Associated Aviation*

29

*Underwriters, Inc.* 409 F.3d 342, 346 (6th Cir. 2005) (applying Michigan law) (citing *Campbell v. Potash Corp. of Sask., Inc.,* 238 F.3d 792, 797 (6th Cir. 2001)). "If a contract is clear and unambiguous ... there is no issue of fact to be determined." *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.,* 210 F.3d 672, 684 (6th Cir. 2000) (quoting *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio,* 15 Ohio St.3d 321, 474 N.E.2d 271, 272–73 (Ohio 1984)). In such instances, a court should not use extrinsic evidence to "attempt to discern the intent of the parties," but rather should determine their intent from "the plain language of the contract." *United States v. Donovan,* 348 F.3d 509, 512 (6th Cir. 2003). "The question of whether the language of an agreement is ambiguous is a question of law." *Id.* (citing *Parrett v. Am. Ship Bldg. Co.,* 990 F.2d 854, 858 (6th Cir. 1993)). Ambiguity exists "if the language is susceptible to two or more reasonable interpretations." *City of Wyandotte v. Consol. Rail Corp.,* 262 F.3d 581, 585 (6th Cir. 2001) (quoting *D'Avanzo v. Wise & Marsac, P.C.,* 223 Mich.App. 314, 565 N.W.2d 915, 918 (Mich. 1997)). "In making such a determination, a district court is counseled to read the contract as a whole, and to give the contract language its ordinary and natural meaning." *Id.* The above principles of contract interpretation establish that ordinarily judges interpret the language of contracts as a matter of law.

If a contract contains ambiguities, it generally becomes the task of the fact-finder to use extrinsic evidence to determine the intent of the parties. "When a contract is ambiguous, it is for the jury to determine the meaning of its terms, subject to proper instructions and based upon 'evidence of the surrounding circumstances and the practical construction of the parties.'" *Scott v. Anchor Motor Freight, Inc.,* 496 F.2d 276, 280 (6th Cir. 1974) (quoting *Tenn. Consol. Coal Co. v. United Mine Workers of Am.,* 416 F.2d 1192, 1198 (6th Cir. 1969)). The jury thus uses extrinsic parol evidence to resolve conflicting terms and meanings of an ambiguous contract. *Lincoln Elec. Co.,* 210 F.3d at 684–85 (quoting *Construction Interior*

> *Sys., Inc. v. Marriott Family Rests., Inc.,* 984 F.2d 749, 754 (6th Cir. 1993)).
>
> Where there is no genuine issue of material fact appropriate for resolution by a fact-finder, however, a court may rely on extrinsic evidence to aid in contract interpretation. The First Circuit has reached the conclusion that "a judge may determine that the extrinsic evidence which is material is uncontested, and so appropriately enter [summary] judgment." *Nadherny v. Roseland Prop. Co.,* 390 F.3d 44, 49 (1st Cir. 2004) (citing *Adria Int'l Group, Inc. v. Ferre Dev. Inc.,* 241 F.3d 103, 111 (1st Cir. 2001)). Or a court may determine that the evidence so overwhelmingly favors one interpretation of the contract that "no reasonable person could decide the contrary." *Id.* (quoting *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.,* 768 F.2d 5, 8 (1st Cir. 1985)). Yet, the Fifth Circuit makes clear that when extrinsic evidence creates a genuine issue of material fact as to the parties' intent, the interpretation of the contract becomes a matter of fact appropriately resolved by a jury. *Southern Natural Gas Co. v. Pursue Energy,* 781 F.2d 1079, 1081 (5th Cir. 1986).

*Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421-22

(6th Cir. 2008) (setting forth the rules in the context of reviewing a summary

judgment ruling).

The arbitrator did not apply these rules of contract construction. As explained

below, if had he done so, he would have recognized that neither of the dispositive

questions here may be answered as a matter of law on the current record because (1)

the contracts are ambiguous in relevant part and (2) the available extrinsic evidence

does not conclusively answer either question. Since neither question should have

been answered as a matter of law, it was error for the arbitrator to grant summary judgment on the record before him.

## C

The Court begins with the question of whether there was (1) a single Road Agreement to which Local 324, Crackers, and Rieth-Riley were all parties or (2) separate Road Agreements between Crackers and Local 324, on one hand, and Rieth-Riley and Local 324, on the other hand.

## 1

The language of the Road Agreement does not clearly indicate whether the agreement is a single contract or a series of separate contracts. None of the language in the Road Agreement directly addresses that issue. And while some of the language indirectly bears on that issue, that language does not definitively establish whether the Road Agreement was intended to be one or more than one CBA. On the contrary, the language is hopelessly ambiguous in that respect.

Some terms in the Road Agreement suggest, as the Fund argues, that the agreement is a template that was intended to be the basis for *separate* CBAs between Local 324 and each individual employer represented by MITA. For instance, at some points, the Road Agreement refers to obligations imposed upon "the Contractor." (*See e.g.*, Road Agreement, ECF No. 19-6, PageID.272, 274-275, 277-278.) The use of the singular term "contractor" along with the article "the" suggests

32

that only one employer is a party to each Road Agreement. The termination provision of the Road Agreement also appears to support the Fund's argument that the Road Agreement is an agreement between only two parties. That provision states that the agreement remains in force unless "either party" provides certain notice to the "other party." (*Id.*, PageID.309.)

Other terms of the Road Agreement suggest, as Crackers contends, that the agreement was a single CBA between Local 324 and each employer represented by MITA. For example, at some points the Road Agreement refers to obligations imposed upon "the Contractors." (*See e.g., id.*, PageID.272, 276, 298-299.) This plural term (which, of course, conflicts with the singular reference discussed immediately above) suggests that the Road Agreement is between Local 324 and more than one employer. Similarly, at some points, the Road Agreement refers to actions undertaken by "a Contractor." (*See e.g.*, *id.*, PageID.278, 300-301.) The use of the article "a" rather than "the" arguably indicates that more than one employer is a party to the Road Agreement. Likewise, the Road Agreement provides that the liability of each employer is "several" rather than "joint" (*id.*, PageID.272), and that limitation on liability only makes sense if more than one employer is a party to the Road Agreement. Indeed, if only one employer was a party to the Road Agreement, there would be no need for the agreement to address the issue of "several" versus "joint" liability. In addition, the Road Agreement refers to MITA "members"

(plural) becoming "parties" (plural) "to this Agreement." (*Id*.) This phrasing further suggests, as Crackers contends, that the Road Agreement is a single agreement between Local 324 and many different MITA members.   Finally, the Road Agreement provides that it covers "*all* highway work … perform[ed] in the State of Michigan" by the employers who are parties to the agreement. (*Id*.; emphasis added.) That language suggests that there is a single Road Agreement because separate, employer-specific agreements would not cover "all" highway work performed in Michigan by the MITA members who agreed to the terms of the Road Agreement.

Because the Road Agreement contains the conflicting language set forth above, it does not clearly indicate whether it is a single CBA to which Crackers, Rieth-Riley, and Local 324 are all parties, or separate CBAs between the union and each MITA member such as Crackers and Rieth-Riley.

## 2

Likewise, the extrinsic evidence in the record does not establish whether there was a single Road Agreement or multiple individual Road Agreements.  The most relevant piece of extrinsic evidence is an affidavit from Heath Salisbury, a member of Local 324, in which Mr. Salisbury describes his duties overseeing the relationship between Local 324 and the employers under the Road Agreement. (*See* Salisbury Aff., ECF No. 21-16.)   Mr. Salisbury does not directly address the question of whether there was only one Road Agreement, but some of his statements indirectly

touch on that issue.  For instance, Mr. Salisbury refers to the steps that an employer would have to take if it wished to enter into "a contract" with Local 324 (*id*. at ¶ 6, PageID.872-873), and that statement arguably suggests, as the Fund contends, that each employer had a separate Road Agreement with Local 324.  But other statements in the affidavit indirectly suggest that there may have been a single Road Agreement between Local 324 and all of the employers.  For example, Mr. Salisbury refers to "approximately 120-130 separate Employers" who were simultaneously "bound to" the Road Agreement. (*Id.* at ¶ 7, PageID.873.)  Mr. Salisbury further refers to some of the employers who were bound by the Road Agreement as "Me Too contractors" (*id*. at ¶ 8, PageID.873), and that term arguably indicates that the employers joined on to a single Road Agreement.  In the end, Mr. Salisbury's affidavit does not shed substantial light on whether there was more than one Road Agreement.

Nor does the remaining extrinsic evidence.  That evidence primarily consists of limited correspondence and deposition testimony. (*See e.g.*, Union Disclaimer Correspondence, ECF No. 19-10; Crackers Correspondence to MITA, ECF No. 19-16; Weber Aff., ECF No. 19-21; Local 324's Correspondence with Crackers, ECF No. 20-1, PageID.654; Affidavit of Katelyn Zonker, ECF No. 20-1, PageID.588-589.)  None of that evidence directly addresses the number of Road Agreements, and none adds much clarity to that issue.  The available extrinsic evidence therefore provides no substantial guidance on the key question here.

**3**

In sum, because the language of the Road Agreement does not clearly indicate whether the agreement is one or more than one CBA, and because the available extrinsic evidence also does not conclusively resolve that question, the question may not be answered as a matter of law on the current record.  It was error for the arbitrator to do so.[9]

**D**

The Court next turns to the 2017 Winter Maintenance Agreement and the question of whether that agreement is a stand-alone CBA that is independent of the Road Agreement.

**1**

The Court begins with the language of the 2017 Winter Maintenance Agreement.  The Fund argues that that language clearly shows that the agreement must have had its own independent existence apart from the Road Agreement.  The

---

[9] As explained above, both Crackers and Rieth-Riley became bound to the terms of the Road Agreement after signing powers of attorney with MITA.  The language of those documents adds little clarity to the issue of whether there was one Road Agreement between Local 324 and all of the employers represented by MITA or separate Road Agreements between Local 324 and each employer.  None of the terms in the powers-of-attorney specifically address that issue.  And the only language that is arguably relevant to that issue is ambiguous.  In that language, the power-of-attorney appoint MITA "to negotiate and sign [CBAs]" with Local 324. (*See* Rieth-Riley POA, ECF No. 21-11, PageID.856; Crackers POA, ECF No. 19-5, PageID.267.)  But this language does not make clear whether any CBAs reached by MITA will be employer-specific or will have more than one employer as parties.

Fund directs the Court to the provision of the 2017 Winter Maintenance Agreement titled "Termination." That provision states that the 2017 Winter Maintenance Agreement "shall remain in full force and effect" until February 29, 2020. (2017 Winter Maintenance Agmt., ECF No. 19-25, PageID.434.) That end date is nearly two years *later* than the June 1, 2018, end date specified in the Road Agreement. The Fund contends that the 2017 Winter Maintenance Agreement had to be independent from the Road Agreement because the 2017 Winter Maintenance Agreement was intended to remain in full force and effect even after the Road Agreement terminated. (*See* 10/24/2023 Hr'g Tr., ECF No. 27, PageID.999.) That is a serious argument.

But other provisions of the 2017 Winter Maintenance Agreement suggest that it was not intended to, and could not, outlast the Road Agreement. Consider the provision titled "Annual Duration." That provision states that if an employee works more than 8 weeks during the period covered by the 2017 Winter Maintenance Agreement, then Rieth-Riley shall contribute to the Fund for the work done after the 8-week period "at the rate identified in the" Road Agreement. (2017 Winter Maintenance Agmt., ECF No. 19-25, PageID.434.) But the Road Agreement does not purport to identify any contribution rate to be paid after its termination. There is thus a reasonable argument that the "Annual Duration" provision of the 2017 Winter Maintenance Agreement depends upon the Road Agreement being in force

and effect and that that provision therefore tends to suggest that the 2017 Winter Maintenance Agreement was not intended to outlast the Road Agreement.  In short, the language of the 2017 Winter Maintenance Agreement, taken as a whole, does not conclusively establish, as the Fund insists, that that agreement must have its own independent existence because it was intended to remain in place after the Road Agreement expired.

The Fund next points to other aspects of the 2017 Winter Maintenance Agreement that, it says, prove that the agreement was intended to be a stand-alone CBA.  More specifically, the Fund highlights that, as compared to the Road Agreement, the 2017 Winter Maintenance Agreement set a "different [contribution] rate in a different time period for a different type of work." (10/24/2023 Hr'g Tr., ECF No. 27, PageID.996.)  The Fund says that in light of these differences, the 2017 Winter Maintenance Agreement must be seen as having its own independent existence separate and apart from the Road Agreement.  This is another serious argument.

But as Crackers correctly points out, these differences do not compel the conclusion as a matter of law that the 2017 Winter Maintenance Agreement was a separate and independent CBA.  These differing provisions of the 2017 Winter Maintenance Agreement may alternatively be seen as addenda to the Road Agreement – as simply extending the coverage of the Road Agreement to a time

38

period and type of work that it did not originally cover.  This view of the 2017 Winter Agreement is reasonable because the agreement incorporates and relies so heavily upon the Road Agreement.  Indeed, the actual written terms of the 2017 Winter Maintenance Agreement address only a narrow subject matter: wages and benefits to be paid to heavy equipment operators, oilers, mechanics and apprentices for asphalt plant and related repair work during the short pre-production season.  The 2017 Winter Maintenance Agreement provided that all other terms and conditions of employment during the specified period would be governed by the Road Agreement. (*See* 2017 Winter Maintenance Agmt., ECF No. 19-25, PageID.433.) This extensive overlap between the 2017 Winter Maintenance Agreement and the Road Agreement suggests that the 2017 Winter Maintenance Agreement may have been merely an expansion of the Road Agreement that extended its coverage to the discrete pre-production season.  Notably, another Judge on this Court has concluded that in light of this overlap, the 2017 Winter Maintenance Agreement "cannot be understood apart from" the Road Agreement and that the 2017 Winter Maintenance Agreement "became incognizable" when the Road Agreement expired. *Operating Eng.'s Local 324 Fringe Ben. Funds v. Rieth-Riley Constr. Co.*, 517 F.Supp.3d 675,

686 (E.D. Mich. 2021), rev'd on other grounds 43 F.4th 617 (6th Cir. 2022).[10]  That Judge's conclusion helps to persuade the Court that it is at least reasonable to view the language of the 2017 Winter Maintenance Agreement, as Crackers does, as merely amending and extending the terms of the Road Agreement, not as creating an independent CBA.  Simply put, the language of the 2017 Winter Maintenance Agreement does not definitively resolve the question of whether that agreement was an independent CBA that existed separate and apart from the Road Agreement.

## 2

The limited available extrinsic evidence likewise does not provide a clear answer as to whether the 2017 Winter Maintenance Agreement was an independent CBA.  Indeed, the record does not appear to contain any extrinsic evidence that sheds meaningful light on the nature of the 2017 Winter Maintenance Agreement and its relationship to the Road Agreement.  None of the affidavits in the record say much, if anything, about the nature of the agreement.  Nor does any of the documentary evidence in the record substantially address that matter.  For these reasons, the question of whether the 2017 Winter Maintenance Agreement was a separate CBA cannot be resolved by the extrinsic evidence in the record.

---

[10] As noted above, the Sixth Circuit reversed the district court's decision in *Operating Eng.'s Local 324 Fringe Ben. Funds v. Rieth-Riley Constr. Co.*, 517 F.Supp. 675 (E.D. Mich. 2021).  But the grounds for reversal did not relate to the portion of the decision cited above.

**3**

In sum, because the language of the 2017 Winter Maintenance Agreement does not clearly indicate whether the agreement was an independent CBA and because the available extrinsic evidence also does not conclusively resolve that question, the question may not be answered as a matter of law on the current record. The Court therefore rejects the Fund's argument that it is entitled to summary judgment under the Partial Cessation Statute on the ground that the 2017 Winter Maintenance Agreement was an independent CBA under which Rieth-Riley was obligated to contribute to the Fund.

**4**

Finally, the Fund offers an alternative argument as to how the existence of the 2017 Winter Maintenance Agreement proves that there was more than one CBA between the Crackers/Rieth-Riley Control Group and Local 324. For purposes of this alternative contention, the Fund is willing to assume that the 2017 Winter Maintenance Agreement was merely an addendum to the terms of the Road Agreement and was not an independent CBA. The Fund says that even if the 2017 Winter Maintenance Agreement merely added terms to the Road Agreement, that addition could only have happened if Rieth-Riley and Crackers each had their own independent Road Agreement with Local 324. As support for this argument, the Fund highlights that the 2017 Winter Maintenance Agreement "distinctly [applied]

to Rieth-Riley and no one else" and was "not part of Crackers' obligation at all in any way, shape or form." (10/24/2023 Hr'g Tr., ECF No. 27, PageID.1001.)  And the Fund stresses that Rieth-Riley and Local 324 were the only signatories to the 2017 Winter Maintenance Agreement. (*See id*.)  The Fund contends that under these circumstances, the 2017 Winter Maintenance Agreement (1) must have been modifying a Road Agreement to which Rieth-Riley and Local 324 were the only parties and (2) could not have been modifying a Road Agreement that included Crackers (or anyone else) as a party.  This is yet another serious argument.

But it does not follow *as a matter of law* that the 2017 Winter Maintenance Agreement could only have been modifying a Road Agreement between Rieth-Riley and Local 324 to which Crackers was not a party.  On the contrary, it is possible that (1) Crackers and Rieth-Riley both entered into a single Road Agreement with Local 324 and (2) Rieth-Riley and Local 324 entered into the 2017 Winter Maintenance Agreement in order to expand their obligations to one another *under the terms of that single Road Agreement*.  The Fund's contrary conclusion seems to rest upon its view that it is legally impossible for three parties to enter into an agreement and for two of those parties to separately modify their specific obligations to one another under that same contract (without modifying either of their obligations to the third party to the contract).  But the Fund cites no authority for that proposition, and the Court is aware of none.  Thus, the Court is not persuaded by the Fund's argument

42

that the existence of the 2017 Winter Maintenance Agreement establishes as a matter of law that (1) Crackers and Rieth-Riley each had their own Road Agreements with Local 324, (2) the Crackers/Rieth-Riley Control Group thus had more than one CBA with Local 324, and therefore (3) a partial withdrawal occurred under the Partial Cessation Statute when Crackers' contribution obligations under the Road Agreement ended.

E

For all of the reasons explained above, the question of whether Crackers may be held liable for a partial withdrawal under the Patrial Cessation Statute cannot be decided as a matter of law based upon the current record.[11]  The arbitrator reached the contrary conclusion, in part, because he failed to apply the "basic rules" of contract construction applied by the Court above.  But the arbitrator's error went

---

[11] The Fund offers several policy arguments in support of its assertion that Crackers should be deemed to have partially withdrawn as a matter of law. (*See* Fund Reply Br., ECF No. 24, PageID.946-947.)  In these arguments, the Fund contends that a ruling in Crackers' favor – *i.e.*, a ruling that Crackers did not partially withdraw under the circumstances presented here – would have a "detrimental effect" on pension funds. (*Id*.)  The problem with these arguments is that they expressly rest upon the premise that there is a separate and independent Road Agreement between Local 324 and each employer represented by MITA. (*See id*.)  Thus, the policy arguments only work if that premise is correct.  But for all of the reasons explained above, that premise is open to serious debate.  In any event, the Court is not persuaded that it may resolve the difficult question of whether Crackers partially withdrew based upon policy arguments.

beyond failing to apply the governing rules.  For the reasons explained below, his analysis failed on its own terms.

The arbitrator's conclusion that Crackers had partially withdrawn from the Fund rested upon his determination that Crackers and Rieth-Riley had separate Road Agreements with Local 324 (*See* Award, ECF No. 19-2, PageID.233.)  The arbitrator offered "four reasons" in support of that determination.  None of those reasons was sufficient to support the arbitrator's determination; even when considered collectively, the reasons fall short.

The arbitrator's first "reason" was that "Crackers and Rieth-Riley were separate legal entities." (*Id*.)  But that fact does not compel the conclusion that those two companies entered into separate Road Agreements with Local 324.  It is certainly possible for two legally separate entities (like Crackers and Rieth-Riley here) to enter into a single agreement with a third party (like Local 324 here).  For that reason, the fact that Crackers and Rieth-Riley are legally distinct entities is not persuasive evidence that they entered into separate Road Agreements with Local 324.

The arbitrator's second "reason" was actually two "reasons" rolled into one.  He first highlighted that Crackers and Rieth-Riley entered into separate powers-of-attorney with MITA at different times (Rieth-Riley in 2008 and Crackers in 2016) and became bound to contribute to the Fund under the terms of the Road Agreement

at different times (Rieth-Riley in 2013 and Crackers in 2016). (*See id.*)  But the fact that Rieth-Riley and Crackers became bound to the terms of the Road Agreement at different times does not mean that, as a matter of law, they must have had different Road Agreements with Local 324.  It is certainly possible for two parties (here Rieth-Riley and Local 324) to enter into an agreement at one point in time and for a third party (here Crackers) to later join that agreement and become a party to it.  Thus, the fact that the obligations of Rieth-Riley and Crackers under the Road Agreement arose at different times does not provide substantial support for the arbitrator's conclusion that Local 324 had separate Road Agreements with those entities.

As the second part of his second "reason," the arbitrator highlighted that the Road Agreement provides that each employer would have "several," not "joint," liability to Local 324. (*Id.*)  But as noted above, the provision for "several" rather than "joint" liability cuts sharply *against* the arbitrator's ruling; it suggests that there is a *single* Road Agreement between Local 324 and multiple employers, including Crackers and Rieth-Riley.  Indeed, it would have made sense for the drafters of the Road Agreement to provide that the liability of each employer is "separate" only if there was *more than one employer* bound under the agreement.  If, as the arbitrator concluded, Crackers and Rieth-Riley each had their own, stand-alone Road Agreement with Local 324, then the language providing for "several" rather than "joint" liability in those agreements would have been meaningless surplusage.  For

all of these reasons, both components of the arbitrator's second "reason" do not provide strong support for his determination that Rieth-Riley and Crackers had separate Road Agreements with Local 324.

The arbitrator's third "reason" was that the NLRA imposed "different obligations" upon Rieth-Riley and Crackers "when the Road Agreement expired on June 1, 2018." (*Id.*, PageID.234.)  More specifically, and as described above, Rieth-Riley was subject to Section 9(a), and that statute required Rieth-Riley continue to contribute to the Fund under the terms of the Road Agreement for a period of time after that agreement ended.  In contrast, as further noted above, Crackers was subject to Section 8(f) and therefore had "no obligation" to continue making contributions to the Fund or to bargain with Local 324 when the Road Agreement expired. (*Id.*) But the arbitrator never explained why or how the fact that different statutes applied to Rieth-Riley and Crackers following termination of the Road Agreement compels (or even supports) his conclusion that Crackers and Rieth-Riley necessarily had separate Road Agreements with Local 324.  And it is not clear to the Court why that would be so.  Indeed, it certainly seems possible that two parties to the same contract could have their post-termination obligations governed by different statutes.  The Court therefore concludes that the arbitrator's third "reason" was insufficient to support his determination that Rieth-Riley and Crackers must have had separate Road Agreements with Local 324.

Finally, the arbitrator's fourth "reason" related to the 2017 Winter Maintenance Agreement and tracked the Fund's alternative argument (addressed above) based on that agreement. (*See id.*)  In this reason, the arbitrator stressed that the 2017 Winter Maintenance Agreement was "in effect during the time Crackers had a Road Agreement [], but [it was] only signed by Rieth-Riley and only affected Rieth-Riley's obligations." (*Id.*) From these facts, the arbitrator concluded that the 2017 Winter Maintenance Agreement could only have been amending and/or affecting a stand-alone Road Agreement between Rieth-Riley and Local 324 to which Crackers was not a party. (*See id*.)  But for the reasons explained above (in Section (IV)(D)(4)), that conclusion does not follow as a matter of law.

In sum, while some of the arbitrator's four "reasons" lent some support to his determination that Rieth-Riley and Crackers had separate Road Agreements with Local 324, those reasons – even when considered together – do not justify that conclusion as a matter of law.  That is another reason that the arbitrator erred when he granted summary judgment in favor of the Fund for the reasons stated in the Award.

**V**

For all of the reasons explained above, **IT IS HEREBY ORDERED** as follows:

- Crackers' Motion for Summary Judgment (ECF No. 19) is **GRANTED** to the extent that Crackers asks the Court to **VACATE** the Award. The motion is **DENIED** to the extent that it seeks a ruling that, as a matter of law, Cracker did not partially withdraw from the Fund;

- The Fund's Motion for Summary Judgment (ECF No. 20) is **DENIED**; and

- This action is **REMANDED** to the arbitrator for further proceedings consistent with this Opinion and Order.[12]

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: February 23, 2024

---

[12] To be clear, the Court is not holding that the question of whether Crackers partially withdrew under the Partial Cessation Statute can never be determined as a matter of law. Instead, the Court holds only that that question cannot be determined as a matter of law on the current record. If one party later develops and presents conclusive extrinsic evidence on a dispositive issue under the Partial Cessation Statute, it may be appropriate for the arbitrator to decide the question of Crackers' partial withdrawal liability under the statute as a matter of law in the context of a renewed motion for summary judgment. Absent such evidence, the arbitrator should resolve the question in his capacity as fact-finder after weighing and hearing the competing evidence.

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 23, 2024, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126